United States District Court
Southern District of Texas

**ENTERED**
March 24, 2022
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-21-3229 |
| | § | (CRIMINAL NO. H-17-412) |
| MERCY O. AINABE, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

The defendant, Mercy O. Ainabe ("Defendant"), has filed a Memorandum in Support of Mercy O. Ainabe's Motion to Vacate, Set Aside, or Correct Sentence Pursuant to 28 U.S.C. 2255 ("Defendant's Motion") (Docket Entry No. 133). The United States has filed the United States of America's Brief in Opposition to Mercy Ainabe's Motion to Vacate, Set Aside, or Correct Sentence ("Government's Brief") (Docket Entry No. 143). Based on a careful review of the parties' arguments, the court's recollection of the relevant proceedings, and the application of governing legal authorities, Defendant's Motion will be denied, and the corresponding Civil Action No. H-21-3229 will be dismissed.

## I. Factual and Procedural Background

Defendant was first charged with violations of federal law on July 5, 2017.[1] On November 30, 2017, a grand jury sitting in the

_____

[1]Indictment, Docket Entry No. 1. For purposes of identification all page numbers reference the pagination imprinted at the top of the page by the court's Electronic Case Filing ("ECF") system.

Southern District of Texas returned a seven-count Superseding Indictment charging Defendant with one count of conspiracy to Commit Healthcare Fraud in violation of 19 U.S.C. § 1349, five counts of Healthcare Fraud in violation of 18 U.S.C. §§ 1347 and 2, and one count of Conspiracy to Pay Healthcare Kickbacks in violation of 18 U.S.C. § 371.[2]

The charges arose out of Defendant's role as patient recruiter for Texas Tender Care, Inc. ("TTC"), a Houston-area home health services provider.[3]   The Superseding Indictment alleged that Defendant conspired with Magdalene Akharamen and others to defraud Medicare and aided and abetted in a healthcare fraud scheme.[4] Akharamen was an Owner, Director, Officer, Administrator, and Managing Employee of TTC.[5]   The Superseding Indictment further alleged that as part of the fraud scheme Defendant and Akharamen through TTC billed Medicare for approximately $3,590,141.92 for claim reimbursements to which they and TTC were not entitled.[6]   At trial FBI Agent Paul Nixon testified that in addition to her conduct with TTC, Defendant also recruited beneficiaries for fraudulent billing from Gulf EMS, an ambulance company, and Gifter

---

[2]Superseding Indictment, Docket Entry No. 26, pp. 3-7 ¶¶ 11-25.

[3]Id. at 3 ¶ 10.

[4]Id. at 3-6 ¶¶ 12-20.

[5]Id. at 3 ¶ 9.

[6]Id. at 5 ¶¶ 17-19.

Medical Group, a company which purported to provide diagnostic testing.[7]

Defendant and her co-conspirator, Akharamen, would pay beneficiaries, physicians, physical therapy companies, and others for paperwork, Medicare beneficiary information, and other services.[8] Specifically, Defendant would pay beneficiaries for their Medicare information, pay physicians to authorize medically unnecessary home-health services for those beneficiaries, and then bill Medicare for those services the beneficiaries did not need, qualify for, or receive.[9] After paying kickbacks to the beneficiaries, physicians, and others, Defendant and Akharamen would split the remaining proceeds.[10]

After receiving a target letter from the Government and through the time of the Original Indictment, Defendant was represented by Gregory Awere. At the time of the Superseding Indictment Defendant was represented by Ike Waobikeze. For over four months before and during trial Defendant was represented by Mario Rojas Madrid. Soon after the trial and during sentencing, Defendant was represented by Seth Kretzer.[11]

---

[7]Transcript of Jury Trial, Volume 3, Docket Entry No. 99, p. 37 line 14 - p. 39 line 21.

[8]Superseding Indictment, Docket Entry No. 26, p. 5 ¶ 15.

[9]See id.

[10]See id. ¶ 16.

[11]Defendant's Motion, Docket Entry No. 133, p. 7.

On May 2, 2018, a jury found Defendant guilty on all seven counts.[12]  On October 5, 2018, the court sentenced Defendant to 108 months' imprisonment and $3,444,791.70 in restitution.[13]  Defendant appealed.[14]   The Fifth Circuit entered judgment in the appeal in January of 2020 affirming the conviction and sentence. United States of America v. Mercy O. Ainabe, 938 F.3d 685 (5th Cir. 2019), cert. denied, 141 S. Ct. 259 (2020).

On October 4, 2021, Defendant filed Defendant's Motion, asserting that Defendant "received ineffective assistance of counsel at the pre-trial plea-bargaining stage of her case, at trial, and at sentencing."[15]  The United States filed Government's Brief on January 31, 2022 (Docket Entry No. 143).  On March 3, 2022, Defendant filed Memorandum of Law in Support of Mercy O. Ainabe's Response to Government's Opposition to Motion to Vacate, Set Aside, or Correct Sentence Pursuant to 28 U.S.C. 2255 ("Defendant's Reply") (Docket Entry No. 145).

## II.  Standard of Review

The Sixth Amendment guarantees each criminal defendant "the Assistance of Counsel for his defence."  U.S. CONST. amend. VI.

---

[12]Verdict, Docket Entry No. 62.

[13]Judgment in a Criminal Case, Docket Entry No. 107, pp. 3 and 6.

[14]Appeal from the United States District Court for the Southern District of Texas, Docket Entry No. 117.

[15]Defendant's Motion, Docket Entry No. 133, p. 1.

Courts have long accepted that this is a right to "'the effective assistance of counsel.'" United States v. Gonzalez, 943 F.3d 979, 983 (5th Cir. 2019) (quoting McMann v. Richardson, 90 S. Ct. 1441, 1449 (1970)) (emphasis in Gonzalez). A criminal defendant in federal custody claiming ineffective assistance of counsel may vindicate his Sixth Amendment rights by way of a Motion to Vacate, Set Aside, or Correct Sentence under 28 U.S.C. § 2255. If the court concludes that the prisoner's motion is meritorious, it must "vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate." 28 U.S.C. § 2255(b).

A defendant's ineffective-assistance claim is analyzed under the two-part test set forth in Strickland v. Washington, 104 S. Ct. 2052 (1984). To prevail under the Strickland standard, a defendant must demonstrate that (1) counsel's performance fell below an objective standard of reasonableness and (2) there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. Hinton v. Alabama, 134 S. Ct. 1081, 1088 (2014). If a movant fails to meet one of these tests, the court need not inquire whether the movant has met the other. See United States v. Bejarano, 751 F.3d 280, 285 (2014) ("'Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim.'") (quoting Strickland, 104 S. Ct. at 2071).

To demonstrate deficient performance "the defendant must show that counsel's representation fell below an objective standard of reasonableness." Strickland, 104 S. Ct. at 2064. This is a "highly deferential" inquiry in which "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Id. at 2065-66. To overcome this presumption, a defendant must identify acts or omissions of counsel that were not the result of reasonable professional judgment. Id.

Even assuming that a defendant can demonstrate error by his counsel, he must still demonstrate the requisite prejudice in order to prevail. See id. ("An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment."). To establish prejudice under Strickland, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 2068.

A prisoner seeking relief under 28 U.S.C. § 2255 "must clear a significantly higher hurdle" than the standard that would exist on direct appeal. United States v. Frady, 102 S. Ct. 1584, 1593 (1982). After a defendant has been convicted and has exhausted or waived any right to appeal, a court is normally "entitled to presume that [he] stands fairly and finally convicted." United States v. Willis, 273 F.3d 592, 595 (5th Cir. 2001) (citations omitted).

-6-

## III.   <u>Discussion</u>

**A.   Pre-Trial Counsel**

Defendant alleges two grounds on which her pre-trial counsel was deficient:  (1) during the pre-trial phase, Defendant asked Waobikeze to file a motion to dismiss the charges, but Waobikeze refused;[16] and (2) Waobikeze failed to advise Defendant of a plea offer from the Government.[17]

### 1.   <u>Failure to File a Motion to Dismiss</u>

Defendant argues that Waobikeze's refusal to file a motion to dismiss constituted ineffective assistance of counsel "because the evidence presented by the government was largely circumstantial."[18] Defendant does not cite any authority to support the argument that this refusal constituted deficient performance, and Defendant's Reply does not mention it.  A jury found that the evidence against Defendant — circumstantial or otherwise — was sufficient to prove her guilt on all counts beyond a reasonable doubt.  It therefore seems plausible that Waobikeze's decision not to file a motion to dismiss was based on his reasonable professional assessment of the evidence.  The court concludes that Defendant's allegation is not sufficient to overcome the "strong[] presum[ption]" that counsel "rendered adequate assistance" and that his decision not to file a

_____

[16]Defendant's Motion, Docket Entry No. 133, p. 7.

[17]<u>Id.</u> at 12.

[18]Defendant's Motion, Docket Entry No. 133, p. 13.

motion to dismiss was the product of "reasonable professional judgment." Strickland, 104 S. Ct. at 2066.

### 2.   The Plea Offer

Defendant submitted a sworn affidavit from her current counsel, Karla Aghedo, in which Aghedo states that the trial attorney for the Government told her that the Government discussed a plea offer with Waobikeze in 2017.[19] Aghedo states that she spoke to Waobikeze, who told her that the Government made a plea offer in Defendant's case.[20] On November 21, 2017, Waobikeze filed a motion to withdraw from the case,[21] after which Defendant hired her trial counsel, Mario Rojas Madrid.[22]

Aghedo states that Waobikeze "said he recalled that [a] plea offer was made[,]" but that Waobikeze also "said he could not find a plea offer in the form of a letter or email" and that he "had no written notes in his personal working files related to a plea offer from the government in Ainabe's case or an effort to advise Ainabe of such an offer."[23]   Mario Madrid, Defendant's trial counsel, states that when he inquired about a plea deal, the Government

---

[19]Affidavit of Karla J. Aghedo ("Aghedo Affidavit"), Exhibit 2 to Defendant's Motion, Docket Entry No. 133-2, p. 1 ¶ 1.

[20]Id. at 2 ¶¶ 4, 7.

[21]Emergency Motion to Withdraw, Docket Entry No. 22.

[22]Affidavit of Mercy O. Ainabe, Exhibit 1 to Defendant's Motion, Docket Entry No. 133-1, p. 2 ¶ 10.

[23]Aghedo Affidavit, Exhibit 2 to Defendant's Motion, Docket Entry No. 133-2, p. 2 ¶¶ 4, 6.

"made it clear that there was no plea offer and that the Government was prepared and desired to move forward with trial."[24]

At a pretrial conference on March 22, 2018, the court inquired with Defendant, Mr. Madrid, and Government attorney, Elizabeth Young, about the existence of a plea offer, and the following colloquy took place:

THE COURT:     I've tried many [] healthcare fraud cases and invariably after the defendant has be[e]n sentenced, the defendant files a motion complaining that her attorney did not provide effective assistance.

The first argument is frequently made that the defendant did not know that the government was willing to make a plea agreement. Had the defendant known, he or she would have accepted the plea and avoid going to trial and avoided a higher sentence.

I want the government to state on the record what, if any, plea offer, and if more than one, the last offer the government has made the defendant?

MS. YOUNG:     Thank you, Your Honor. The government did back in August of 2017 present the evidence to the defendant against her and asked if she would like to engage in a plea negotiation. They did address her in person, and at that point she said, through her lawyer, that she did not want to engage in a plea discussion with the government.

THE COURT:     So there is no offer?

MS. YOUNG:     No, Your Honor.

---

[24]Affidavit of Mario Madrid ("Madrid Affidavit"), Docket Entry No. 141, p. 2 ¶ 4.

THE COURT:        Is that correct?

MR. MADRID:       I wasn't there.  I've been on the case
                  since December, I think, 18th.  Sometime
                  at the end of that month I talked to
                  Mr. Pennebaker about the subject, and his
                  position is that there weren't any
                  offers.

THE COURT:        All right.  So there's no offer for the
                  defendant to consider?

MR. MADRID:       Correct.  And I discussed that with my
                  client.

THE COURT:        All right.  Ms. Ainabe, would you please
                  stand.

                  This is your third lawyer.  Sometimes the
                  presence of three lawyers indicates []
                  that the defendant is dissatisfied with
                  the first lawyers and may not be
                  listening to what the lawyers tell[] her.
                  I don't know if that's the situation now,
                  but before we go to trial, I want to ask
                  you:  Are you fully satisfied with what
                  Mr. Madrid has done on your behalf?

DEFENDANT:        Yes, sir.

THE COURT:        Do you have any complaints about what he
                  has done or not done on your behalf?

DEFENDANT:        No, Your Honor.

THE COURT:        Is there anything you've asked him to do
                  that he has failed to do?

DEFENDANT:        No, Your Honor.

THE COURT:        All right.  Thank you.  You may sit down.

MR. MADRID:       And, Your Honor, if I can add, Ms. Ainabe
                  has been at my office for in excess of
                  ten hours, I think this past – maybe 15
                  hours in this last week, seven or eight
                  hours, discussing the case and her
                  options and my representations to her.

Transcript of Pretrial Conference, Docket Entry No. 100, p. 3 line 15 - p. 5 line 18 (emphasis added).

The colloquy shows that there was never any formal plea offer, and that at most the Government indicated a willingness to open a plea negotiation, but that Defendant refused. Defendant's only evidence of a plea offer is Aghedo's account of informal conversations with the Government's trial attorney and Defendant's pre-trial counsel. Aghedo's Affidavit does not indicate whether this plea offer was ever formally tendered or whether it was merely discussed in a cursory, hypothetical fashion. Defendant's evidence is insufficient to show that the Government ever formally offered her a plea agreement.

Even if the court assumed that all the statements attributed to Waobikeze in Aghedo's Affidavit are true, Defendant's claim of ineffective pre-trial counsel would lack merit because Waobikeze states that he did communicate the plea offer to Defendant, and that Defendant refused the offer.[25] Aghedo's Affidavit further states that Waobikeze told Aghedo that he withdrew from the case because Defendant insisted on going to trial.[26] The court concludes that Defendant has failed to show that counsel's representation "fell below an objective standard of reasonableness." See Strickland, 104 S. Ct. at 2064.

---

[25]Aghedo Affidavit, Exhibit 2 to Defendant's Motion, Docket Entry No. 133-2, p. 2 ¶ 7.

[26]Id.

Even if Defendant had shown that Waobikeze committed an error by not presenting her with a plea offer, she cannot show prejudice. To show prejudice, Defendant must show that

> but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (i.e., that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed.

Lafler v. Cooper, 132 S. Ct. 1376, 1385 (2012).

Defendant cannot make this showing because (1) as indicated by the colloquy at the pre-trial conference on March 22, 2018, there was never any formal plea offer that Defendant would have accepted; and (2) Defendant has not presented any evidence as to what the alleged 2017 plea offer would have entailed. Without any details of the offer's terms, it is impossible for the court to determine whether Defendant's sentence under those terms would have been "less severe than under the judgment and sentence that in fact were imposed." See Lafler, 132 S. Ct. at 1385. Defendant therefore fails to show the prejudice necessary to prevail on a § 2255 motion.

## B.  Trial Counsel

Defendant asserts that her trial counsel, Mario Madrid, rendered ineffective assistance because he (1) failed to object to an "inadmissible" audio recording,[27] (2) failed to object to the

---

[27]Defendant's Motion, Docket Entry No. 133, p. 13.

in-court identifications of Defendant by two witnesses,[28] (3) failed

to object to testimony about Defendant's signature,[29] and (4) failed

to investigate "potential key witnesses" and prepare to cross-

examine Government witnesses.[30]

    1.   <u>Failure to Object to Audio Recording</u>

    Defendant contends that Madrid "rendered ineffective

assistance when he failed to object to the impermissibly

prejudicial evidence related to an inaudible recording made in a

foreign language purporting to capture a conversation where Ainabe

engaged in criminal conduct."[31]   Defendant alleges that the

Government did not provide her with an opportunity "to fairly

confront and rebut this evidence" because (1) "both Akharamen and

Nixon testified that the recording was inaudible[,]" and (2) "both

Akharamen and Nixon testified that the conversation captured in the

recording took place in Esham, a West African language."[32]   Madrid

states that his decision not to object was "based on strategy and

to show the lack of credibility of the witness and the

prosecution's case."[33]

---

   [28]<u>Id.</u> at 16.

   [29]<u>Id.</u> at 21.

   [30]<u>Id.</u> at 22.

   [31]Defendant's Motion, Docket Entry No. 133, p. 13.

   [32]<u>Id.</u> at 13-14.

   [33]Madrid Affidavit, Docket Entry No. 141, pp. 2-3 ¶ 5.

"A decision regarding trial tactics cannot be the basis for a claim of ineffective assistance of counsel unless counsel's tactics are shown to be 'so ill chosen that it permeates the entire trial with obvious unfairness.'" Teague v. Scott, 60 F.3d 1167, 1172 (5th Cir. 1995) (quoting Garland v. Maggio, 717 F.2d 199, 206 (5th Cir. 1983)). Defendant alleges that the recording was "inaudible" and that the jury could not understand it,[34] but also alleges that the recording "tipped the scales in favor of the government[,]" and that it had "an elevated level of importance" in the trial.[35] Defendant does not explain how an inaudible, unintelligible recording could have persuaded the jury, or how it could have assumed an "elevated level of importance." Accordingly, Defendant does not show that Madrid's decision not to object to the recording created any "obvious unfairness," see Maggio, 717 F.2d at 206. Defendant has failed to show either deficient performance or prejudice.

## 2.  Failure to Object to In-Court Identification

Defendant contends that trial counsel rendered ineffective assistance by "failing to object to the in-court identifications of Ainabe by two patients who received care from [TTC] and purportedly received kickbacks as part of the alleged scheme."[36]

_____

[34]Defendant's Motion, Docket Entry No. 133, p. 13.

[35]Id. at 15.

[36]Id. at 16.

-14-

Defendant states that the first witness correctly identified Defendant in court and then testified that Defendant gave her $11.00, "but the government never asked or explained what the $11 was for[,]" thus leaving the jury to "impermissibly assume" that the money could have been a kickback.[37] Defendant does not explain why the identification itself was objectionable.

Defendant states that the second witness said three times under oath that she could not recognize anyone in the courtroom, that Madrid actually objected on the third iteration of the question, but that the Government was allowed to display a picture of Defendant during the witness's testimony.[38] Defendant further states that after seeing the picture, the witness "testified that Ainabe, as displayed in the picture, was the person who came to her job and recruited her to be a patient with [TTC]."[39] Defendant does not cite any authority suggesting that identification by way of photograph is improper. She does not allege that the photograph was not an accurate image of her. She does not explain why a failure to object to these identifications should constitute deficient performance.

Madrid states that "there was no evidence that the witnesses had been tampered with or that the identification was tainted" and that "one witness was unable to identify Ms. Ainabe and the other

---

[37] Id.

[38] Id. at 17-18.

[39] Id. at 18.

-15-

witness [was] not credible and did not further the state's case."[40]
Even if another attorney might have objected to some or all of this
evidence, that alone is not enough to demonstrate deficient
performance.  See Smith v. Collins, 977 F.2d 951, 960 (5th Cir.
1992) (holding that Strickland recognizes a "'wide range of
professionally competent assistance[,]'" which "necessarily allows
for situations in which each of two opposite courses of action may
properly fall within the ambit of acceptable professional conduct")
(quoting Strickland, 104 S. Ct. at 2066).  The court concludes that
Defendant's arguments regarding in-court identification lack merit,
and that they show neither deficient performance nor prejudice.

    3.   Failure to Object to Signature Testimony

    Defendant argues that Madrid rendered deficient performance by
failing to challenge the testimony of FBI Agent Paul Nixon, who
testified concerning Defendant's signature on checks and Medicare
documents.[41]  According to Defendant, no foundation had been laid
for how Agent Nixon would have personal knowledge of Defendant's
signature.[42]

    The specific exchange at issue consisted of the Government's
attorney presenting a document to Agent Nixon and asking him who
signed it, to which Agent Nixon responded:    "Looks like

---

[40]Madrid Affidavit, Docket Entry No. 141, p. 3 ¶ 6.

[41]Defendant's Motion, Docket Entry No. 133, pp. 21-22.

[42]Id.

Ms. Ainabe's signature."[43]  Agent Nixon's statement does not purport to be that of a witness who is familiar with Defendant's signature. He did not, for example, testify that the signature matched Defendant's handwriting.  A rational juror could conclude that Agent Nixon was simply reading the name that was signed on the signature block.

Federal Rule of Evidence 701 provides that a witness may testify on a matter that is "rationally based on the witness's perception; helpful to clearly understanding the witness's testimony or to determining a fact in issue; and not based on scientific, technical, or other specialized knowledge."  Reading a signature to state that it "looks like Ms. Ainabe's signature" was an opinion rationally based on Agent Nixon's perception in accordance with the rule and was admissible.

Further, according to Madrid, "there was voluminous evidence of Ms. Ainabe's signature from signed checks to her Medicare enrollment application."[44]   Madrid states that he spent hours reviewing documents and evidence with Defendant, and that she never indicated to him that the signatures were not hers.[45]   In fact, Madrid states that Defendant "actually agreed that the signatures

_____

[43]Transcript of Jury Trial, Volume 3, Docket Entry No. 99, p. 41 lines 22-23.

[44]Madrid Affidavit, Docket Entry No. 141, p. 3 ¶ 7.

[45]Id.

-17-

in the documents and checks were her signature."[46]    It was not deficient performance for Madrid to refrain from making an objection that, to his mind, lacked a good-faith basis.

4.    Failure to Investigate and Prepare for Cross-Examination

Defendant argues that Madrid rendered ineffective assistance because he "failed to investigate potential key witnesses and prepare to cross examine [TTC] employees, patients and doctors who testified on behalf of the government."[47]

Defendant states that she "specifically asked trial counsel to subpoena the medical records and billing data for the three patients discussed during trial[,]" but that trial counsel did not use these medical records during cross-examination "to demonstrate billing and payment for legitimate services."[48]  Defendant does not explain how this evidence would have persuaded the jury if it had been presented at trial.  That the patients in question may have billed Medicare for some legitimate medical services does not negate evidence that Medicare was billed for illegitimate purposes as part of Defendant's kickback scheme.

Defendant also contends that "trial counsel failed to contact healthcare providers and patients whose names appeared in the government's discovery memoranda as evidence provided by . . .

_____

[46]Id.

[47]Defendant's Motion, Docket Entry No. 133, p. 22.

[48]Id. at 23.

Magdalene Akharamen."[49]  The crux of this argument is that there was at least one doctor in Houston, one TTC patient allegedly referred by Defendant, and several employees at TTC who did not know Defendant.[50]  This evidence is unsurprising and unpersuasive, as Madrid states in his affidavit:  "Making the point that a doctor or patient did not know all the employees or owners of a home health care business is not an argument to the credibility of the witnesses or a defense to this type of prosecution."[51]  Defendant's final argument fails to establish that trial counsel was deficient.

## C.    Sentencing Counsel

At sentencing, the court applied two enhancements that Defendant contests.  First, it applied an eighteen-level enhancement for a loss of "more than $3.5 million," pursuant to U.S.S.G. § 2B1.1(b)(1)(J).[52]  The basis for this enhancement was the fraudulent amount billed by Defendant on behalf of TTC ($3.59 million) or, alternatively, the relevant conduct by Defendant on behalf of Gulf EMS and Gifter ($4,593,378.71).[53]  Under either figure the loss amount was over the $3.5 million threshold. Second, the court applied a three-level enhancement for a loss to

---

[49]Id.

[50]See id. at 23-24.

[51]Madrid Affidavit, Docket Entry No. 141, pp. 3-4.

[52]Defendant's Motion, Docket Entry No. 133, p. 9.

[53]Transcript of Sentencing, Docket Entry No. 110, p. 4 line 13 - p. 5 lines 4 and 17.

a government healthcare program "greater than $7 million" pursuant to U.S.S.G. § 2B1.1(b)(7)(B)(ii).[54]  To arrive at the loss calculation applicable to both Guideline provisions, the court considered Medicare claims submitted during Defendant's time at Gulf EMS and Gifter as "relevant conduct."[55]

Defendant argues that her sentencing counsel, Seth Kretzer, rendered deficient performance because he "failed to object to use of the total amount billed by [TTC] between August 2011 and August 2015 as the amount of actual loss, without requiring the government to prove that every claim submitted during that time [was] fraudulent."[56]  Defendant argues that, while Kretzer objected to inclusion of the billing for Gulf EMS and Gifter, "he never objected to the sentencing court's assumption that the total amount billed by [TTC], Gulf, and Gifter reflected the intended loss and therefore the actual loss amount."[57]  According to Defendant, the evidence supporting the enhancements was insufficient because "[n]o one ever testified, and no one was ever asked to testify, about whether every single claim filed by these three entities was fraudulent."[58]

---

[54]Defendant's Motion, Docket Entry No. 133, p. 9.

[55]Id. at 9-10.

[56]Id. at 28.

[57]Id.

[58]Id. at 29.

Defendant cites <u>United States v. Hebron,</u> 684 F.3d 554, 561-62 (5th Cir. 2012), for the proposition that "the burden is on the government to show some factual basis for concluding that [those losses were the result of] fraud."[59]  But <u>Hebron</u> does not stand for the proposition that the Government must prove that "every single claim filed" was fraudulent in order for the court to consider the total amount billed as part of its loss calculation.  In <u>Hebron</u> the Fifth Circuit held that a district court did not err in its loss calculation by including some legitimate claims with fraudulent ones because the fraud "was so extensive and pervasive that separating legitimate benefits from fraudulent ones [was] not reasonably practicable," and so "the burden shift[ed] to the defendant to make a showing that particular amounts are legitimate."  <u>Id.</u> at 563.  The Fifth Circuit applied this same reasoning to a Medicare fraud case where there was "reliable evidence of extensive fraud[.]"  <u>United States v. Mazkouri,</u> 945 F.3d 293, 304 (5th Cir. 2019); <u>see also United States v. Dubor,</u> 821 F. App'x 327, 329 (5th Cir. 2020) (holding that where defendant "committed extensive Medicare fraud for over five years by paying tens of thousands of dollars in illegal kickbacks for referrals, . . . [he] had to establish that he was entitled to an offset against the PSR's actual-loss estimate").

"Considering the difficulties of calculating loss in some cases, exactitude is not required."  <u>Id.; see also United States v.</u>

---

[59]<u>Id.</u>

De Nieto, 922 F.3d 669, 675 (5th Cir. 2019) (noting that loss need not be determined with "absolute certainty" (internal quotation marks and citation omitted)).   In estimating loss, "[a] district court may rely upon information in the [Pre-Sentence Investigation Report] . . . so long as that 'information bears some indicia of reliability.'" United States v. Danhach, 815 F.3d 228, 238 (5th Cir. 2016) (quoting United States v. Simpson, 741 F.3d 539, 557 (5th Cir. 2014)).

The Pre-Sentence Investigation Report ("PSR") in this case showed that Defendant referred about 30 Medicare beneficiaries to TTC alone.[60]   The PSR also showed that from January of 2007 to April of 2010 Gulf EMS submitted $4,341,790.60 in fraudulent claims for ambulance services, including non-covered routine ambulance transportation and some ambulance rides that were never actually provided.[61]   The PSR estimated that Defendant billed Medicare $8,264,032.52 in fraudulent claims.[62]   The court concludes that this is reliable evidence of extensive fraud, sufficient to shift the burden to Defendant to demonstrate how much of her loss calculation was based on legitimate billings that should not have been considered.   Because Defendant did not present evidence rebutting the PSR's loss estimate, it was proper for the court to rely on that estimate.

---

[60]PSR, Docket Entry No. 90, p. 9 ¶ 31.

[61]Id. at 11 ¶¶ 38-40.

[62]Id. at 12 ¶ 42.

-22-

Moreover, the Fifth Circuit examined the issue of loss calculation when Defendant appealed and held that the court did not err when it used the aggregate amounts billed to calculate the intended loss. United States v. Ainabe, 938 F.3d 685, 693 (5th Cir. 2019).

## D. Sixth Amendment Right to Trial

Defendant argues that the sentencing violated her right to trial by jury "because none of the evidence presented at the jury trial supported the 21-point enhancement for the total amount of loss."[63] Defendant contends that her Sixth Amendment rights were violated when the court "used facts to enhance her sentence when those facts had not been proven to a jury beyond a reasonable doubt."[64]

Defendant relies on the case of United States v. Kirkham, 129 F. App'x 61, 76 (5th Cir. 2005),[65] in which the court held that "[t]he Supreme Court's recent decision in United States v. Booker makes clear that imposition of a sentence based on facts found by the sentencing judge rather than by a jury or a confessing defendant, under a mandatory sentencing guidelines regime, violates a defendant's Sixth Amendment rights." Defendant quotes this language but misses the operative phrase, "under a mandatory

---

[63]Defendant's Motion, Docket Entry No. 133, p. 25.

[64]Id. at 27.

[65]Id.

-23-

sentencing guidelines regime."  The Booker decision made the Guidelines advisory rather than mandatory, United States v. Booker, 125 S. Ct. 738, 757 (2005), and therefore allowed for the imposition of a sentence based on facts found by the sentencing judge.

> Booker contemplates that, with the mandatory use of the Guidelines excised, the Sixth Amendment will not impede a sentencing judge from finding all facts relevant to sentencing. The sentencing judge is entitled to find by a preponderance of the evidence all the facts relevant to the determination of a Guideline sentencing range and all facts relevant to the determination of a non-Guidelines sentence.

United States v. Mares, 402 F.3d 511, 519 (5th Cir. 2005) (internal citation omitted).

Accordingly, the court did not violate Defendant's right to a jury trial by making certain factual determinations that were relevant to sentencing.

## IV.  Conclusion and Order

Based on the foregoing, Mercy O. Ainabe's Motion to Vacate, Set Aside, or Correct Sentence Pursuant to 28 U.S.C. 2255 (Docket Entry No. 133) is **DENIED**; the corresponding civil action will be dismissed with prejudice.

**SIGNED** at Houston, Texas, on this the 24th day of March, 2022.

SIM LAKE
SENIOR UNITED STATES DISTRICT JUDGE